**Opinion issued March 18, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NOS. 01-13-00214-CR**
**01-13-00215-CR**
**01-13-00216-CR**

————————————

**BRET LEE GARDNER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1336695, 1336696, and 1336697**

---

## OPINION

The State charged Brett Gardner with three offenses of possession of child

pornography. TEX. PENAL CODE ANN. § 43.26 (West Supp. 2013). Gardner moved

to suppress evidence obtained through execution of a search warrant at his home and his confession to having committed the offenses, which was procured during interviews with law enforcement. The trial court denied the motions, and, pursuant to a plea agreement with the State, Gardner pleaded guilty to all three offenses. The trial court assessed a sentence of six years' confinement for each charge; it certified Gardner's right to appeal the suppression ruling.

On appeal, Gardner contends that the police obtained his confession in an audio recording during custodial interrogations, in violation article 38.22 of the Texas Code of Criminal Procedure and *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). He further contends that the warrant did not provide probable cause to search his home. Finding no error, we affirm.

**Background**

Gardner lived in LaPorte with his parents and grandfather. The LaPorte Police Department learned through an investigation that someone at the Gardners' house had used an Internet connection to share child pornography. Detective D. Huckabee with the LaPorte Police Department, executed an affidavit in support of a warrant to search the Gardners' house. In the affidavit, Huckabee outlined his extensive experience and specialized training, including his membership on the Internet Crimes Against Children Task Force and twenty-six years' experience in investigating sexual crimes against children, including five years specializing in

the investigation of Internet crimes against children. Based on his experience, training, and expertise, Huckabee testified to the following information:

- Peer-to-peer networks are the most pervasive method for the Internet distribution of child pornography.

- These networks enable individual users, through the use of a variety of software, to connect through each computer's unique Internet Protocol (IP) address and share image files within the network.

- Specialized software allows investigators to compare the digital hash values of files shared by network users with the digital hash values of known child pornography provided by the National Center for Missing and Exploited Children, which acts as a clearinghouse for child pornography images and videos.

- Comparison of hash values for the shared files with the hash values for the confirmed child pornography files provides an extremely accurate method for identifying individuals who possess and own child pornography.

- The software investigation method also allows the investigator to narrow his search to confirmed images of child pornography possessed or shared within a particular geographic location.

- In an online investigation in January 2012, Huckabee located an IP address—registered to Comcast Cable Communications and originating from an area in LaPorte, Texas—that was advertising files for sharing on a peer-to-peer network. The names of the files in the suspect share folder appeared to identify them as containing child pornography.

- Huckabee downloaded files from the suspect share folder and confirmed that they depicted child pornography.

- Through a Houston Metro Internet Crimes Against Children administrative subpoena served on Comcast, Huckabee obtained information concerning the identity of the customer assigned the IP

3

address used for the file sharing and confirmed that it had been assigned to the Gardner household.

The police department secured a warrant based on Huckabee's affidavit. One morning in February 2012, shortly before dawn, Huckabee, Houston Police Department Detective J. Roscoe, who also belonged to the Internet Crimes Against Children Task Force, and computer forensic examiner Detective N. Gates, accompanied by six other law enforcement officers, arrived at the Gardners' house to execute the search warrant. The officers' parked cars filled the Gardners' driveway, blocking any ingress or egress.

The officers located computer equipment in Gardner's bedroom. While Gates previewed the files stored on the computer drives, Huckabee and Roscoe brought Gardner to speak with them in a patrol car, where they could record the interview. Roscoe advised Gardner at the beginning of the interview that he and Huckabee would like to talk to Gardner, that he wasn't under arrest, and that he was free to leave at any time. Gardner agreed to talk to Huckabee and Roscoe.

This first interview lasted nearly an hour. Several times during the interview, Gardner mentioned that he wasn't sure if he should have a lawyer with him and said that he might rather have one present. Each time, one of the officers reminded Gardner that the car doors were unlocked, he was free to end the interview and leave the patrol car whenever he wanted, and he could have an

4

attorney present before answering their questions. When Gardner unequivocally stated that he wanted an attorney, the officers ended the interview.

Gardner and the officers left the patrol car and returned to the house. They sat at the kitchen table while the officers spoke with Gardner's mother. They showed Gardner's mother some of the pornographic images the police had found on a digital storage device stored under Gardner's bed. Gardner's mother became upset, and Gardner had a discussion with her. Gardner then turned to Huckabee and Roscoe and told them that he wanted to talk to them again. Huckabee, Roscoe, and Gardner returned to the patrol car, where they recorded a second interview. Huckabee reiterated that Gardner did not have to talk to the officers. Gardner confirmed that he had changed his mind and wanted to talk without counsel, expressing a desire to cause as little pain to his parents as possible. At no time during this second, approximately forty-minute interview, did Gardner request an attorney. At the end of the interview, Gardner left the patrol car. The officers questioned Gardners' parents and his grandfather and collected evidence. About three hours after they arrived, they left the scene. Approximately one month later, Detective Huckabee obtained an arrest warrant and arrested Gardner.

In his testimony at the suppression hearing, Gardner recounted that, initially, the officers escorted him and his grandfather in their pajamas to the front porch of the house. The officers would not let them re-enter the house to change into pants

5

and a shirt. About a half an hour later, the officers brought Gardner and his grandfather into the living room and allowed them to change their clothes.

Gardner testified that Huckabee asked Gardner to accompany him to the patrol car to have a conversation. Gardner did not recall if Huckabee told him he was free to leave at the beginning or at the very end of the interview. He remembered asking for an attorney multiple times, but the officers ignored his requests. When Gardner ended the interview, the officers brought Gardner back to the house. Then, the officers showed his mother the pornographic images they had found and asked Gardner whether he was ready to go back to the car. According to Gardner, he agreed because he assumed he had no other choice.

After an evidentiary hearing on Gardner's motion to suppress, the trial court made the following findings of fact and conclusions of law:

- Gardner was not in custody on February 3, 2012, making article 38.22, section 3 of the Texas Code of Criminal Procedure inapplicable;

- Gardner gave two video-recorded statements to Huckabee, during which Roscoe also was present;

- Gardner was sitting, without handcuffs, in the backseat of a police vehicle parked outside his residence while he gave the statements;

- During the end of the first interview depicted in the video-recorded statement, Gardner invoked his right to counsel, and the interview ceased;

- Gardner exited the vehicle and returned to his residence;

6

- Subsequently, Gardner expressed his desire to have further discussions with the aforementioned police officers;

- Gardner expressly waived his right to counsel before the second video-recorded statement;

- At the end of the second video-recorded statement, Gardner again exited the police vehicle and returned to his house;

- Gardner was not arrested on February 3, 2012;

- Gardner was in no way threatened or coerced by law enforcement to provide either of the video-recorded statements and gave both statements freely and voluntarily;

- Huckabee, who testified in connection with the admissibility of Gardner's statements, testified truthfully; and

- Both of the video-recorded statements were admissible for all purposes in the proceedings.

## Discussion

*Standard of review*

We review a ruling on a motion to suppress for an abuse of discretion. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013); *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We review a trial court's factual findings for abuse of discretion and its application of the law to the facts de novo. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). We defer to a trial court's determination of historical facts, especially those based on an evaluation of a witness's credibility or demeanor. *Turrubiate*, 399 S.W.3d at 150;

7

*Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012). We apply the same deference to review mixed questions of law and fact. *Turrubiate*, 399 S.W.3d at 150. When, as in this case, the trial court makes findings of fact and conclusions of law, we will uphold the trial court's ruling if it is "reasonably supported by the record and is correct on any theory of law applicable to the case." *Id.* (citing *Valiterra v. State*, 310 S.W.3d 442, 447-48 (Tex. Crim. App. 2010)). *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

### *Custodial interrogation*

Gardner contends that the trial court erred in denying his motion to suppress because Gardner was in custody when he confessed to his crimes. According to Gardner, the two police interviews violated *Miranda* and article 38.22 of the Texas Code of Criminal Procedure.

The Fourth Amendment of the United States Constitution and Article I, Section 9 of the Texas Constitution protect against unreasonable searches and seizures by government officials. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *Atkins v. State*, 882 S.W.2d 910, 912 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). In *Miranda*, the United States Supreme Court determined that an accused, held in custody, must be given required warnings before questioning. 384 U.S. at 444–45, 86 S. Ct. at 1612; *see Jones v. State*, 119 S.W.3d 766, 772 (Tex.

Crim. App. 2003). Law enforcement's failure to comply with the *Miranda* requirements results in forfeiture of the use of any statement obtained during that questioning by the prosecution during its case-in-chief. *Id.* Similarly, the Texas Code of Criminal Procedure provides that a statement is admissible against a defendant in a criminal proceeding if, among other things, the defendant was warned as the statute requires before the statement was made, and the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a) (West 2005).

As with the *Miranda* warnings, the article 38.22 warnings are required only for custodial interrogations. *Id.*; *Woods*, 152 S.W.3d at 116; TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a). Our understanding of "custody" for purposes of article 38.22 is consistent with the meaning of "custody" for purposes of *Miranda*. *Herrera*, 241 S.W.3d at 526. "Custody," for purposes of *Miranda* and article 38.22, includes the following: (1) the suspect is physically deprived of his freedom of action in a significant way; (2) a law enforcement officer tells the suspect he is not free to leave; (3) law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) probable cause exists to arrest the suspect, and law enforcement officers do not tell the suspect he is free to leave. *Gardner v. State*, 306 S.W.3d

9

274, 294 (Tex. Crim. App. 2009) (citing *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)). The fourth situation exists only when the officer communicates the knowledge of probable cause to the suspect or the suspect concedes the existence of probable cause to the officer. *Dowthitt*, 931 S.W.3d at 255. Such a concession, however, does not automatically establish a custodial interrogation; rather, it is a factor to consider, together with other circumstances, to determine whether a reasonable person would believe that he is under restraint to a degree associated with an arrest. *Id.*; *Ervin v. State*, 333 S.W.3d 187, 211 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

Additional circumstances to consider for determining whether an interrogation is custodial include whether the suspect arrived at the interrogation place voluntarily, the length of the interrogation, any requests by the suspect to see relatives or friends, and the degree of control exercised over the suspect. *Ervin*, 333 S.W.3d at 205; *Xu v. State*, 100 S.W.3d 408, 413 (Tex. App.—San Antonio 2002, pet. ref'd). An interrogation that begins as noncustodial can evolve; police conduct during the encounter may escalate the interview to a custodial interrogation. *Dowthitt*, 931 S.W.2d at 255.

Gardner points to the following circumstances as supporting a reasonable belief that he was under arrest:

- The officers asked to speak with Gardner immediately when they arrived to execute the warrant;

10

- The patrol cars blocked the Gardners' driveway during the search and subsequent interviews;

- The officers escorted Gardner throughout the morning, first outside and to the patrol car for the interview, then back into the house, then back to the patrol car for the second interview;

- Gardner mentioned an interest in speaking to an attorney several times during the first interview, but the officers did not offer him a telephone and continued to interrogate him;

- The officers coerced Gardner into confessing by showing the child pornography to his mother; and

- Gardner was interviewed for approximately forty-five minutes each time.

Gardner likens these circumstances to those addressed in *United States v. Cavazos*, in which the Fifth Circuit Court of Appeals found that the defendant was subjected to custodial interrogation. 668 F.3d 190 (5th Cir. 2012). Under the circumstances in *Cavazos*, immigration enforcement agents awoke the defendant and his family at about 6:00 A.M. *Id.* at 195. The agents handcuffed the defendant and brought him to the kitchen table. They then removed the handcuffs and informed Cavazos that they were conducting a "non-custodial interview."' *Id.* The agents allowed Cavazos to eat, drink, and use the restroom before they questioned him. *Id.* The officers allowed Cavazos to make a telephone call, but they required him to hold the phone so that they could listen to the call. *Id.* After completing the interview,

11

the officers read the defendant his *Miranda* rights and then formally arrested him. *Id.*

Gardner's interviews significantly differ in circumstance from those in *Cavazos*. The officers escorted Gardner to avoid any interference with the officers executing the search warrant. The record supports the trial court's finding that the officers did not use handcuffs. Gardner willingly accompanied the officers to the patrol car for both interviews. During the first interview, Gardner did not unequivocally state that he wanted to consult an attorney. The officers reiterated during the interview that Gardner was free to end the interview and leave the patrol car at any time. Consistent with the trial court's finding, the video recording shows that when Gardner finally stated that he did not want to continue the interview without an attorney present, the officers ended the interview. Gardner did not ask the officers for a telephone at any time during the interviews, and the officers did not refuse to allow Gardner to use the telephone. And, while it may have been inconvenient for Gardner to leave the house due to the number of patrol cars blocking the exit, nothing in the record shows that the officers intended to continue to detain Gardner after they had finished executing the warrant.

In contrast to *Cavazos*, the officers left the Gardner home after executing the warrant and did not arrest Gardner until several weeks later, after they procured a warrant for his arrest. This factor weighs heavily in favor of finding that Gardner

12

was not in custody. *See United States v. Jones*, 523 F.3d 1235, 1243–44 (10th Cir. 2008) (*quoting* 2 Wayne R. LaFave et al., CRIMINAL PROCEDURE § 6.6(c) (3d ed. 2007) (collecting cases in which courts have relied on fact that defendant was allowed to leave following interrogation as strong evidence that interrogation was not custodial). The circumstances in this case do not involve a show of force, actual physical restraint, or the deprivation of privacy that led the Fifth Circuit in *Cavazos* to conclude that reasonable person would have believed that he was under restraint to the degree associated with an arrest. Viewing the evidence in the light most favorable to the trial court's ruling, we hold that the trial court did not abuse its discretion in denying Gardner's motion to suppress his confession.

*Probable cause to search*

Gardner further contends that the trial court erred in denying his motion to suppress the evidence obtained in executing the search warrant, because the police lacked probable cause to conduct the search. A magistrate may not issue a search warrant unless police present an affidavit setting forth sufficient facts to show that probable cause exists for its issuance. TEX. CODE CRIM. PROC. ANN. art. 18.01(b) (West Supp. 2013). The affidavit must show that:

    (1) a specific offense has been committed,

    (2) the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and

13

(3) the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched.

*Id.* art. 18.01(c) (West Supp. 2013). In reviewing the sufficiency of an affidavit, we defer to all reasonable inferences that the magistrate and trial court could have made. *See Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007); *Jones v. State*, 338 S.W.3d 725, 733 (Tex. App.—Houston [1st Dist.] 2011), *aff'd*, 364 S.W.3d 854 (Tex. Crim. App. 2012). Probable cause exists if, under the totality of the circumstances, there is a "fair probability" or "substantial chance" that contraband or evidence of a crime will be found at the specified location. *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 243 n.13, 103 S. Ct. 2317, 2335 n.13 (1983)).

Gardner specifically contends that Huckabee's statements about the software program that linked a computer at the Gardners' residence to images of child pornography were not based on his personal knowledge. If an officer, however, has otherwise trustworthy information sufficient to warrant a person of reasonable caution to believe that an offense was or is being committed, then personal knowledge is not essential. *See Torres v. State*, 182 S.W.3d 899, 901–02 (Tex. Crim. App. 2005) ("Because *Castillo* [*v. State*, 818 S.W.2d 803 (Tex. Crim. App. 1991)], may be interpreted to require both personal knowledge and trustworthy

14

information, we overrule it and its progeny only to the extent that it requires both kinds of information to support probable cause.").

In his affidavit, Huckabee describes his experience, training, and expertise in investigating Internet crimes against children and in identifying individuals suspected of those crimes through the use of a nationally recognized database and specialized software programs. Huckabee detailed specific files identified in his investigation. He confirmed that certain files had names associated with known images of child pornography and described the contents of those files. Huckabee described methods used to disseminate pornographic images. He confirmed that a computer using an IP address assigned to the Gardners' home contained images of child pornography and that someone at that address had used software and file sharing methods commonly used among child pornographers. Gardner did not challenge Huckabee's credentials or expertise. We hold that the affidavit provided probable cause for issuing the search warrant. *See State v. Moore,* No. 05-06-01295-CR, 2007 WL 4305374, at \*5 (Tex. App.—Dallas Dec. 11, 2007, pet. ref'd) (not designated for publication) (reversing pretrial order granting motion to suppress because affiant averred that defendant had internet access at his home and using his name, set up a Yahoo account; pornographic images were uploaded to that account from computer located in defendant's home supported reasonable inference that child pornography would be found at defendant's residence); *see*

15

*also State v. Cotter*, 360 S.W.3d 647, 652–53 (Tex. App.—Amarillo 2012, no pet.) (holding that information from reliable entity confirming that defendant was the Internet subscriber associated with the IP addresses at issue and used screen name involved in crime supported probable cause for warrant).

## Conclusion

Because the record supports the trial court's findings that Gardner was not in custody when he gave the two video-recorded statements and that probable cause existed to obtain a search warrant, we hold that the trial court correctly denied Gardner's motions to suppress. We therefore affirm the judgment of the trial court.


Jane Bland
Justice

Panel consists of Justices Keyes, Bland, and Brown.

Publish. TEX. R. APP. P. 47.2.

16